## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| **BARBRETTA COLLIE, as the surviving daughter of decedent, MARY LINDSEY,**<br>2822 Lyndhurst Ave.<br>St Louis, MO 63031<br><br>        **Plaintiff,**<br><br>**v.**<br><br>**RANCHO MANOR HEALTHCARE AND REHABILITATION CENTER, LLC**<br><u>Serve Registered Agent</u><br>Jeff Davis<br>3625 Magnolia Avenue<br>St. Louis, MO 63110<br><br>**SW FINANCIAL SERVICES CO.**<br><u>Serve Registered Agent</u>:<br>Sheldon Wolfe<br>6651 N. Drake Avenue<br>Lincolnwood, IL 60712<br><br>**SHELDON WOLFE**<br><u>Serve:</u><br>6651 N. Drake Avenue<br>Lincolnwood, IL 60712<br><br>**ALBERT MILSTEIN**<br><u>Serve:</u><br>7437 North Skokie Boulevard<br>Skokie, IL 60077<br><br>        **Defendant(s).** | Case No.<br><br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFFF'S COMPLAINT

The Plaintiffs, by and through undersigned counsel, submit this Complaint for Damages

against the above-named Defendant(s), and in further support, states and alleges as follows:



*Filing of*
*Steele Chaffee*

1

## PLAINTIFF

1.       Mary Lindsey ("Resident") died on January 11, 2021, from an avoidable pressure ulcer and urinary tract infection developed at Rancho Manor Healthcare and Rehabilitation Center, a Missouri skilled nursing facility located at 615 Rancho Lane, Florissant, MO 63031 ("The Facility).

2.       Plaintiff, Barbretta Collie, is, and always relevant hereto, an adult over the age of 21 and a citizen of the state of Missouri.

3.       Decedent Mary Lindsey was a citizen of the state of Missouri at the time of his death.

4.       Plaintiff is a surviving child of Resident, and therefore, a member of the class of individuals authorized to pursue a wrongful death claim pursuant to RSMo. § 537.080.

## DEFENDANTS

5.       Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

### Rancho Manor Healthcare and Rehabilitation Center, LLC ("RANCHO MANOR")

6.       At all times relevant, Rancho Manor Healthcare and Rehabilitation Center, LLC was a Missouri limited liability company and owned, operated, managed, maintained, and/or controlled, in whole or in part, and did business as RANCHO MANOR ("Facility" or "the Facility") which is a Missouri licensed nursing home located at 615 Rancho Lane, Florissant, MO 63031.



7.      As such, RANCHO MANOR was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling RANCHO MANOR.

8.      Consequently, RANCHO MANOR, owed a duty to Resident to use reasonable care for Resident's safety while under the care and supervision at RANCHO MANOR.

### SHELDON WOLFE ("WOLFE")

9.      WOLFE has been always relevant to this action a citizen of Illinois.

10.      WOLFE was substantially engaged in the leasing, control, management, staffing, fiscal budgeting, oversight, risk management, regulatory compliance, implementation and enforcement of policies and procedures, consultation with and/or operation of the licensee, RANCHO MANOR by exercising final authority over (1) staffing budgets; (2) the development and implementation of nursing policies and procedures; (3) the hiring and firing of the administrator; (4) appointing the governing body that is legally responsible for establishing and implementing policies regarding the management and operation of RANCHO MANOR.

11.      These actions and decisions had a direct impact on the care provided to all residents including Resident and caused the injuries at issue in this lawsuit.

12.      Moreover, WOLFE operated, managed, maintained, and/or controlled RANCHO MANOR by binding the nursing home to contracts with related parties – as defined by the Centers for Medicare and Medicaid Services – for dollar amounts that far exceeded the fair value of those services and resulted in funds being diverted out of RANCHO MANOR that could and should have been utilized to hire enough nursing staff.


*Filing of*
*Steele Chaffee*

3

13.     These actions and business decisions had a direct impact on the care provided to all residents including Resident and caused the injuries at issue in this lawsuit.

14.     Consequently, WOLFE owed a duty to Resident to use reasonable care for Resident's safety while under his care and supervision at RANCHO MANOR.

15.     WOLFE willfully participated in the tortious acts that are the subject of this Petition.

### ALBERT MILSTEIN ("MILSTEIN")

16.     Plaintiff incorporates by reference the allegations previously set forth and further allege as follows

17.     MILSTEIN has been always relevant to this action a citizen of Illinois.

18.     MILSTEIN was substantially engaged in the leasing, control, management, staffing, fiscal budgeting, oversight, risk management, regulatory compliance, implementation and enforcement of policies and procedures, consultation with and/or operation of the licensee, RANCHO MANOR by exercising final authority over (1) staffing budgets; (2) the development and implementation of nursing policies and procedures; (3) the hiring and firing of the administrator; (4) appointing the governing body that is legally responsible for establishing and implementing policies regarding the management and operation of RANCHO MANOR.

19.     These actions and decisions had a direct impact on the care provided to all residents including Resident and caused the injuries at issue in this lawsuit.



Filing of
Steele Chaffee

4

20.     Moreover, MILSTEIN operated, managed, maintained, and/or controlled RANCHO MANOR by binding the nursing home to contracts with related parties – as defined by the Centers for Medicare and Medicaid Services – for dollar amounts that far exceeded the fair value of those services and resulted in funds being diverted out of RANCHO MANOR that could and should have been utilized to hire enough nursing staff.

21.     These actions and business decisions had a direct impact on the care provided to all residents including Resident and caused the injuries at issue in this lawsuit.

22.     Consequently, MILSTEIN owed a duty to Resident to use reasonable care for Resident's safety while under his care and supervision at RANCHO MANOR.

23.     MILSTEIN willfully participated in the tortious acts that are the subject of this Petition.

### SW FINANCIAL SERVICES CO. ("SW")

24.     At all times relevant to this action, Defendant SW FINANCIAL SERVICES CO. ("SW") was an Illinois company and was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling RANCHO MANOR.

25.     At all times relevant to this action, SW, and/or individuals or entities acting on its behalf, operated, managed, maintained, and/or controlled, in whole or in part, RANCHO MANOR.



*Filing of*
*Steele Chaffee*

5

26.     SW, and/or individuals or entities acting on its behalf, operated, managed, maintained, and controlled RANCHO MANOR by exercising final authority over:

    a.  Staffing budgets;

    b.  The development and implementation of nursing policies and procedures;

    c.  The hiring and firing of the administrator; and

    d.  Appointing the governing body that is legally responsible for establishing and implementing policies regarding the management and operation of RANCHO MANOR.

27.     These actions and business decisions had a direct impact on the care provided to all residents including Resident.

28.     Consequently, SW owed a duty to Resident to use reasonable care for Resident's safety while under its care and supervision at RANCHO MANOR and breached said duty for all the reasons stated in this Complaint.

## DEFENDANTS' JOINT ENTERPRISE/VENTURE

29.     Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

30.     Defendants RANCHO MANOR, WOLFE, SW, and MILSTEIN ("Joint Venture Defendants") were engaged in a joint venture in that:

    a.  The Joint Venture Defendants had an agreement, express and/or implied, among the members of the group to operate RANCHO MANOR, a Missouri licensed nursing home;

    b.  The Joint Venture Defendants had had a common purpose to operate RANCHO MANOR, a Missouri licensed nursing home;

    c.  The Joint Venture Defendants had a community of pecuniary interest in the operation of RANCHO MANOR, a Missouri licensed nursing home; and



    d.  The Joint Venture Defendants had had an equal right to a voice in the direction of the operation of RANCHO MANOR, a Missouri licensed nursing home.

31.    There has been always a close relationship between the Joint Venture Defendants relevant.

32.    Because of the joint venture, the Joint Venture Defendants owed a joint duty to Resident to use reasonable care for their safety while under their care and supervision at RANCHO MANOR.

## JURISDICTION AND VENUE

33.    Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

34.    The only members of the limited liability company RANCHO MANOR are WOLFE, MILSTEIN, Mo Herman, and Jeremey Amster.

35.    WOLFE, MILSTEIN, Mo Herman, Jeremy Amster are each citizens of Illinois.

36.    Thus, RANCHO MANOR is a citizen of the state Illinois by way of each of its members being citizens of the state of Illinois.

37.    SW is an Illinois corporation with its principal place of business in the State of Illinois.

38.    Thus, SW is a citizen of the state Illinois

39.    Plaintiff is is a citizen of Missouri

40.    Decedent was a citizen of the state of Missouri at the time of his death.



41.     Therefore, Plaintiff brings her claims contained in the Complaint under federal diversity jurisdiction, 28 U.S.C. § 1332(a)(1), as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

42.     Pursuant to RSMo § 506.500.1(3), defendants, purposefully availed themselves of the protections and/or benefits of the laws in Missouri by committing tortious acts within the state including, but not limited to, failing to ensure that RANCHO MANOR had appropriate policies and procedures for its nursing staff, was properly capitalized, funded, staffed, and that staff received adequate training and supervision, thereby making jurisdiction proper in this Court.

43.     A substantial part of the events or omissions giving rise to the claims described in the Complaint occurred in this District of Missouri, thereby making venue proper in this Court.

## AGENCY

44.     Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

45.     The acts hereinafter described were performed by the agents, representatives, servants, and employees of Defendants and were performed either with the full knowledge and consent of Defendants, and/or were performed by their agents, representatives, servants, or employees during the scope of their agency, representation, or employment with the Defendants.

46.     Furthermore, the acts hereinafter described as being performed by the agents, representatives, servants, or employees of Defendants were performed or were supposed to be performed on behalf of and/or for the benefit of Resident.



FACTUAL BACKGROUND

47.     Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

Defendants' Treatment of Resident

48.     Upon admission to RANCHO MANOR on 10/14/20, Resident was at risk for developing skin breakdown, and pressure ulcers and urinary tract infections.

49.     Care provided Resident at Rancho Manor between 10/14/20 and 12/20/20:

   a.   10/15/20 physician orders called for bilateral heel protectors [7].

   b.   10/22/20 nursing notes described intact skin [31].

   c.   On 10/24/20, nurse Simmons-Cowper described a new 0.5 cm open area overlying the coccyx. The head of the bed was elevated at 45°. The pressure injury measured 1 x 0.5 x 0.1 cm [28].

   d.   Vitamin C, zinc sulfate, and Juven nutritional supplementation were ordered 10/24/20 [8, 9].

   e.   Ms. Lindsay was incontinent of bowel and bladder [28].

   f.   The coccyx pressure injury measured 1.2 x 0.8 x 0.1 cm on 10/28/20 [26].

   g.   Collagenase to the coccyx pressure injury was ordered 10/29/20 [9].

   h.   The coccyx pressure injury was unstageable, measuring 5.1 x 1.0 x 0.2 cm on 11/4/20 [24]. There was serosanguineous drainage. Ms. Lindsey rested on a low air loss mattress [24].

   i.   The 11/5/20 dietary note indicated a weight of 133.8 pounds. Tube feedings continued.

   j.   A new right buttock pressure injury measuring 1.8 x 1.0 x 0.1 cm was first noted on 11/10/20 [22].

   k.   The wound team was consulted on 11/11/20 [8]. The coccyx unstageable pressure injury was partly slough covered measuring 5 x 2 x 0.2 cm. A right buttock stage II pressure injury measured 1.8 x 1 x 0.1 cm [22].


*Filing of Steele Chaffee*

l. On 11/18/20, an unstageable coccyx pressure injury measured 4.7 x 2.1 x 0.2 cm. A low air loss mattress and a wheelchair cushion were in use.

m. Nurses described a new skin tear of the right elbow on 11/23/20.

n. An unstageable coccyx pressure injury marked by 50% slough and 50% bright red granulation tissue measuring 4.5 x 2.1 x 0.2 cm was present 11/25/20. There was a small amount of serosanguineous drainage. The right elbow skin tear measured 0.9 x 0.9 x 0.2 cm. It was partly eschar covered and partly granulating. A low air loss mattress and a wheelchair cushion were in use [18].

o. On 12/21/20, the assistant director of nursing Price wrote a note describing healing of the open area on the right buttock on 11/18/20 [11].

p. Collagenase was ordered 12/1/22 the right elbow [9].

q. 12/2/20 physician orders called for tube feedings with Jevity 1.5 at 60 mL per hour for 23 hours daily [6]. The head of the bed was to be elevated at least 30° while tube feedings were administered [7].

r. The dietitian's 12/3/20 note indicated a weight of 130.3 pounds. Body mass index was 24.6. A puréed diet supplemented tube feedings [17].

s. On 12/9/20, a 50% slough covered, 50% granulating unstageable coccyx pressure injury measured 6.0 x 2.0 x 0.2 cm. A right elbow skin tear measured 0.6 x 0.6 x 0.2 cm. This was granulating. A low air loss mattress and a wheelchair cushion were in place [16].

t. On 12/18/20, a 6.0 x 3.0 x 0.2 cm 75% slough covered, 25% granulating coccyx pressure sore discharged a small amount of serosanguineous drainage. An eschar covered 0.6 x 0.6 x 0.2 cm right elbow skin tear was present. Ms. Lindsey rested on a low air loss bed. A wheelchair cushion was in place. Tube feedings continued [14].

u. The head of the bed was elevated at 45° on 12/19/20 [14].

v. Nurse Thomas wrote at 19:05 on 12/19/20, "resident was not responding to verbal or tactile stimuli…diaphoretic… Turned and repositioned and respirations went back to normal.… Dr.Liu" was informed. Blood pressure was 128/68, heart rate 88, respirations 16, temperature 97.5°, and room air oxygen saturation 97% [13].

w. On 12/20/20 at 05:45, nurse Thomas wrote, "writer completed skin assessment on resident prior to transfer with noted areas to right elbow, coccyx, and heels with all treatments being clean, dry, and intact [12]."



50.     Resident received the following care and treatment at SSM DePaul Hospital between 12/20/20 and 1/7/22:

a.  Ms. Lindsey was sent from the nursing home with an elevated respiratory rate and elevated blood sugar. In the emergency room, blood urea nitrogen and creatinine were 76 and 1.97. Sodium was elevated at 152. Potassium was elevated at 5.9. The anion gap was elevated at 22. Glucose was 836. Albumin was 3.1. Lactic acid level was elevated at 9.69. The INR was 2.3. White blood cell count was 9.5 and hemoglobin 16.

b.  Prior to admission, functional status was bedridden [865].

c.  On 12/20/20 at 06:14, blood pressure was 111/73, heart rate 130, and respiratory rate 24. At 06:37, temperature was 99.3° axillary. Ms. Lindsey carried 126 pounds on a 5'1" frame [528]. Examination of the abdomen showed crusted brown drainage surrounding the PEG tube site. The PEG tube site dressing was dated 12/20/20. A large, malodorous sacral pressure injury was present on admission [528]:



Lindsey, Mary M      Scan on 12/20/2020 by Jensen, Carlyn Amanda, RN



d.  Ms. Lindsay was diagnosed with severe sepsis. Ceftriaxone and vancomycin antibiotics were initiated on admission [531].

e.  Admission chest x-ray did not show any acute pulmonary disease [542].

f.  Ms. Lindsey his daughter asked that her mother be made *Do Not Resuscitate, Do Not Intubate*, no pressors, no dialysis status on 12/20/20 [523-524].

g.  Ms. Lindsey was treated for diabetic ketoacidosis, treatment commencing in the emergency room [527].

h.  Ms. Lindsey was treated for decubitus sepsis with bacteremia.

i.  Right heel pressure injury was present on admission:



*Filing of Steele Chaffee*

Lindsey, Mary M        Scan on 12/20/2020 by Jensen, Carlyn Amanda, RN of Right foot



    j.   Left heel pressure injury was present on admission:



Lindsey, Mary M        Scan on 12/20/2020 by Jensen, Carlyn Amanda, RN of Left foot



k.  On 12/21/20, the surgeon described a large necrotic, fluctuant, malodorous sacral pressure injury [592]. Blood urea nitrogen and creatinine had improved to 46 and 0.65. Glucose was 155 [593]. COVID testing was negative. The infectious disease physician described induration around the feeding tube [598].

l.  CT of the abdomen and pelvis showed gas and stranding in the anterior abdominal wall [612]. The PEG tube had retracted into the subcutaneous fat in the anterior abdominal wall and had surrounding phlegmonous change. There was a large amount of stool within the rectum and mild wall thickening suspicious for early stercoral colitis. There were small bilateral pleural effusions and bilateral dependent atelectasis [783].

m.  Abnormal cultures obtained during this admission I reviewed below:

n.  Urine culture grew 12/20/20 50,000-100,000 colonies of *Enterococcus faecalis* and *Aerococcus* [612, 1230].

o.  Pressure injury culture 12/20/20 grew *Proteus mirabilis* [599, 612, 1228].



*Filing of Steele Chaffee*

p.  Blood culture 12/20/20 grew *Enterococcus faecalis*, *Streptococcus simulans* and an extended spectrum beta-lactamase producing *Klebsiella pneumoniae* [1233].

q.  Blood culture 12/21/20 grew *Staphylococcus simulans* and *Klebsiella pneumoniae* [1236, 1238].

r.  Ms. Lindsey was taken to the operating room on 12/22/20. She had abdominal wall cellulitis and bilateral abscesses "due to a misplaced peg feeding tube [614]." The hospitalist described necrotizing fasciitis of the abdominal wall [779]. Ms. Lindsey had a necrotic sacral wound. She underwent the following procedures:

s.  Excisional debridement of necrotic skin, subcutaneous tissue, fascia, and muscle on the right side of the abdomen with a resulting wound measuring 30 x 15 cm.

t.  Excisional debridement of necrotic skin, subcutaneous tissue, fascia, and muscle on the left side of the abdomen, resulting in the wound measuring 20 x 10 cm.

u.  Removal of the dislodged PEG tube from the subcutaneous tissue and placement of a new catheter into the stomach. The surgeon recommended against tube feedings in the immediate postoperative timeframe [785].

v.  Excisional debridement of necrotic skin, subcutaneous tissue, fascia, muscle, ligament, and periosteum from a 15 x 10 cm sacral pressure injury [614].

w.  The sacral pressure injury extended down to bone [717].

x.  12/24/20 sodium was 148 and potassium 3.3. Blood urea nitrogen and creatinine were 14 and 0.48. Albumin had declined to 1.8 [735]. The infectious disease consultant attributed sepsis to an infected sacral pressure injury and anterior abdominal wall infection. The infectious disease consultant attributed bacteremia to sacral pressure injury and anterior abdominal wall infection, recommending ongoing vancomycin, cefepime, and Flagyl antibiotics [736].

y.  Ms. Lindsey was diagnosed with a right calf deep vein thrombosis [738].

z.  Ms. Lindsay received peripheral parenteral nutrition [739].

aa. After debridement, the sacral/coccyx area pressure injury appeared as follows on 12/26/20:



Lindsey, Mary M        Scan on 12/26/2020 by Omalley, Caitlin A, RN of Sacrum



bb. Hospice was consulted 12/28/20 [613] and comfort focused care initiated [908]. Anasarca had developed, attributed to low albumin levels and volume overload [865].

cc. 1/4/21 nursing notes described control of pain with morphine [P47].

dd. On 1/5/21, Ms. Lindsey complained of aching pain in the buttocks and abdomen [P10].

ee. Discharge medications included morphine as needed [520].

51.    Failure of Rancho Manor staff to offload Ms. Lindsey's sacral/coccyx and heels areas caused development and progression of pressure injuries in these areas. The pressure applied to the heels and sacrum/coccyx area exceeded the tissue tolerance to pressure.



Filing of
Steele Chaffee

16

52.     Skin subjected to prolonged contact with urine and feces is more likely to break down. Ms. Lindsey was incontinent of urine and feces. Based on Rancho Manor charting, I am currently unable to determine if appropriate incontinence care were provided in a timely fashion.

53.     The presence of granulation tissue in the sacral/coccyx pressure injury implies adequate blood flow to the area of pressure injury, adequate oxygenation, and adequate nutritional status to allow pressure injury wound healing. Conversely, oxygenation, nutritional reserve, and blood flow should have been sufficient to prevent pressure injury if the heels and sacral/coccyx area were properly offloaded.

54.     There were no episodes of prolonged hypotension (low blood pressure) at Rancho Manor that would have made development/progression/maintenance of pressure injury unavoidable.

55.     There were no episodes of prolonged hypoxemia (low blood oxygen concentrations) at Rancho Manor that would have made development/progression/maintenance of pressure injury unavoidable.

56.     The presence of full thickness pressure injury and pressure injury infection contributed to the anemia of chronic disease. The blood component of serosanguineous drainage contributed to blood loss anemia. Anemia weakened Ms. Lindsey and hastened her demise.

57.     The pressure injury was malodorous.

58.     The sacral/coccyx pressure injury became infected, requiring hospitalization and antibiotic treatment. Sacral pressure injury infection in conjunction with urinary tract infection and abdominal wall necrotizing fasciitis resulted in severe sepsis/bacteremia.



59. Decubitus sepsis was in part or wholly responsible for development of diabetic ketoacidosis.

60. Ms. Lindsey's pressure injury required excisional debridement on 12/22/20 and protracted local care.

61. Pain was associated with sacral/coccyx pressure injury. Pain required administration of opiate analgesics.

62. Proteinaceous exudate emanated from the sacral/coccyx pressure injury. Resting energy expectancy increases by 10% in the presence of pressure sores. Surgery increases resting energy expenditure by a factor of 1.2. Accordingly, the presence of full thickness pressure injury, pressure sore infection, and surgical debridement increased physiological demands on Ms. Lindsey's body, shifting metabolic balance towards catabolism, contributing to malnutrition. Malnutrition weakened Ms. Lindsey, hastening her death.

63. Death was caused by a combination of urinary tract infection, abdominal wall necrotizing fasciitis centered on a dislodged feeding tube, and pressure injury infection. Pressure injury infection was a significant contributing cause to death.

64. None of RANCHO MANOR staff, nor any other defendants conducted a Resident assessment to identify Resident's risk of developing skin breakdown or urinary tract infections.

65. Despite Resident's risk, upon information and belief none of RANCHO MANOR staff, nor any other defendants implemented a Care Plan to address Resident's risk of urinary tract infections, developing a pressure ulcer nor did they implement a turning and repositioning program to offload the pressure on Resident's skin.



66.     Upon information and belief, none of RANCHO MANOR staff:

a.   Properly assessed Resident's developing skin breakdown or pressure ulcers or urinary tract infection;

b.   Implemented or provided the appropriate interventions to prevent Resident from developing a urinary tract infection or pressure ulcer or allowing Resident's pressure ulcer to get worse, including turning or repositioning Resident to offload the pressure on Resident's skin;

c.   Monitored or evaluated Resident's Care Plan to see if the interventions prescribed were working; or

d.   Monitored Resident's urine, skin condition, including Resident's pressure ulcer or measure its size during this time frame.

67.     Upon information and belief, at no point while Resident was a resident at RANCHO MANOR did any of RANCHO MANOR management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from RANCHO MANOR, WOLFE, SW, and MILSTEIN or any other staff member ever provide any sort of in-service training or clinical education to RANCHO MANOR staff regarding the assessment, prevention, use of interventions, monitoring, and reporting of pressure ulcer or urinary tract infection or skin breakdown in residents like Resident.

68.     Upon information and belief, at no point while Resident was a resident at RANCHO MANOR did any of RANCHO MANOR management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from RANCHO MANOR, WOLFE, SW, and MILSTEIN or any other staff member ever implement the appropriate policies and procedures at RANCHO MANOR regarding the assessment, prevention, use of interventions, monitoring, and reporting of pressure ulcer or urinary tract infection in residents like Resident.



69.     Upon information and belief, while Resident was a resident at RANCHO MANOR, RANCHO MANOR did not have an adequate number of staff working daily at RANCHO MANOR to meet Resident's needs, perform the interventions required to prevent Resident's avoidable urinary tract infection and pressure ulcer or prevent the progression of Resident's pressure ulcer, or monitor and adequately supervise Resident's condition.

### Management of RANCHO MANOR

70.     Most skilled nursing homes substantially derive their revenue and profits from the receipt of taxpayer dollars through the federally funded Medicare program.  Under Medicare, residents with higher acuity levels, i.e., a greater number and greater degree of illnesses, place higher demands for care and services on the facility and its staff.

71.     The rate at which the skilled nursing facilities accepting Medicare dollars for the delivery of nursing care and services, and accordingly the amount of their ultimate revenue and profits, are normally based upon the acuity level of the residents confided to their facilities.  Thus, the higher overall and/or average acuity a facility has, the higher their reimbursement rates will be in general.

72.     For purposes of reimbursement, acuity, the amount of care a resident requires, is measured using a process established by The Center for Medicare Services ("CMS").

73.     This process includes a detailed Resident Assessment Instrument, completed by the facility for each resident as varying intervals depending on the resident's circumstance.

74.     The RAI form is known as a "MDS" (Minimum Data Set) and must be certified to CMS by a registered nurse on behalf of the facility.


Filing of
Steele Chaffee

75.     The MDS information provided by the facilities for each resident is processed and CMS assigns a corresponding "RUG Score" which indicates a resident's acuity and reimbursement rate.

76.     CMS correlates this RUG, or acuity, score, to an amount of time necessary to meet the needs of that resident.  Averaging the acuity scores for an entire facility, this time is then represented as Hours Per Patient Day, or HPPD.

77.     This number describes the average amount of care giving time each resident in the facility should receive to sufficiently meet their needs.  For example, if a facility has an HPPD of 2.8, that means that each resident should receive 2.8 hours of care time devoted to meeting their needs.

78.     Just as there is a relationship between the RUG scores HPPD, there is also a relationship between RUG scores and reimbursement rates.

79.     The RUG score, the HPPD and the Reimbursement Rates are all based upon the same information provided by the facilities, and the reimbursement rate is directly related to the amount of time a facility should spend caring for that resident.

80.     Therefore, the amount of money a facility receives is based upon the amount of time the facility should spend caring for that resident, all based upon the assessment information the facility certifies as accurate to CMS.


*Filing of Steele Chaffee*

81.     Acuity levels are reflected in the resident's "Resource Utilization Group" classification or "RUGs". RUGs are mutually exclusive categories that reflect the amount of resources that will be needed in order to meet the needs of a particular resident in a skilled nursing facility. They are assigned to residents based on data derived from an assessment tool referred to as a "Minimum Data Set" ("MDS").

82.     Based on this MDS, each resident's individual care needs (also called "acuity level") are assigned into a group signifying how much nursing or staff care the resident requires, called a Resource Utilization Group score, or "RUG" score.

83.     A completed MDS contains extensive information on a resident's nursing needs, activities of daily living impairments, cognitive status, behavioral problems, and medical diagnoses. This information is used to slot the resident into a RUG.

84.     RUGs are organized in a hierarchy from residents who will need the greatest number of resources to residents who will need the least amount of resources during their stay at the nursing facility. Residents with more specialized nursing requirements, licensed therapies, greater activities of daily living dependency, or other conditions will be assigned to higher groups in the RUG hierarchy.

85.     MDS's are required to be prepared for each resident of a skilled nursing facility when they initially arrive at the facility and periodically after that depending on the course of the resident's medical progression. At a minimum, an MDS is to be prepared for every resident in a skilled nursing facility on a quarterly basis.



86.     The completion of an MDS by a skilled nursing facility is a part of the federally mandated process for clinical assessments of all residents in nursing facilities.  It is a core set of screening, clinical, and functional status elements reported on all residents of nursing facilities regardless of who is paying for the resident's stay in the nursing facility.

87.     MDS's need to be as detailed and comprehensive as possible so that they reflect all the needs of each of the residents in the nursing facility.

88.     When done properly, the MDS provides a comprehensive assessment of each resident's functional capabilities and helps nursing facility staff identify all the health problems of each of their residents.

89.     Each resident's RUG score is contained in section Z of their MDS evaluation, meaning the total care needs of the residents in any facility at a specific time is available by totaling the residents' RUG scores from their MDS evaluations.

90.     The RUG Score also determines the level of compensation a skilled nursing facility will receive to provide the level of care necessary for each of their residents.

91.     Residents in higher RUG categories place higher demands for care and services on the nursing facility and its staff.

92.     Providing care to residents in higher RUG categories is costlier and is, therefore, reimbursed at a higher level.



### Levels of Necessary Care & Expected Staffing

93.     CMS is the federal agency that is tasked with regulating all nursing facilities in this country.  Through the years, CMS has sponsored multiple studies to determine the amount of time that RNs, LPNs, and CNAs in nursing facility spent caring for residents as well as other elements of resident care.

94.     Medicare has commissioned and made available to every nursing home – studies and data – showing the number of minutes of nursing and nursing aide care a person at a specific RUG level should be expected to require.

95.     Because of these studies, CMS can set a number of hours of direct care that they expect to be provided to residents by RNs, LPNs, and CNAs based on the nursing facility's total acuity level.

96.     This expectation is expressed in terms of "hours per patient day" or "HPPD".

97.     With the information gleaned from the MDSs that are provided to CMS by each skilled nursing facility, CMS can determine an HPPD that is expected for each nursing facility in the country.  This is referred to as the "expected HPPD" or simply "expected staffing."

98.     When these RUG scores are combined for all residents in a skilled nursing facility, the nursing home knows exactly how many minutes of nursing and nursing aide care should be provided, on average, to meet the expected care needs of their residents.

99.     The only way to determine the total acuity level and corresponding RUG of each of the residents at a facility such as RANCHO MANOR on any given day is by examining section Z of every MDS in effect on that day.



100.    It is only this empirical data from the MDS Part Z that is necessary to determine the acuity for any resident, and thus determine the staffing for a facility.

101.    It is not necessary to disclose or review any residents' information and the relevant information contained in Section Z of the residents' MDS forms can easily be redacted to prevent unnecessary disclosure of HIPPA protected health information.

### Cost Reporting & Staffing Information

102.    Nursing facilities, like RANCHO MANOR, are required to submit an annual "Cost Report" to CMS, known as "CMS Form 2540-10".  The cost report is a financial report that identifies the cost and charges related to healthcare treatment activities in a particular nursing facility.

103.    Included with the cost reports are extensive details as to how much money the nursing facility spent on RNs, LPNs, and CNAs.  The cost reports reflect the patient census, hours paid, and the hourly rate that the nursing facility paid each category of direct caregivers.

104.    By dividing the paid hours by the patient census in the facility it is possible to determine how many hours the nursing facility paid for each category of direct caregivers per resident per day for the period covered by that cost report.  This number is referred to as the "reported HPPD".

105.    CMS allows the facilities to include all paid hours in the "reported HPPD."  Thus, that number does reflect true direct care hours, but is inflated because "hours paid" includes sick pay and vacation pay both of which reduce the amount of actual HPPD provided by caregivers to residents in nursing facilities.


*SC* Filing of
Steele Chaffee

106.    RANCHO MANOR was also required to report quarterly staffing information through the CMS "Payroll Based Journal" (PBJ) program.

107.    To determine more accurate direct-care hours, it is necessary to examine the data that nursing facilities use to track the number of hours their employees work.  This information is easily accessed through reports that are commonly referred to as "Time Detail Reports", "Punch Detail Data Reports", or some other similarly named report depending on the time-keeping system used by the nursing facility.

108.    The more detailed Punch Detail or time records will note vacation or sick time paid and thus, reveal actual hours worked in the facility.  This information reveals a more accurate direct care number and allows the calculation of the actual HPPD for any period including a year, a quarter, a month, or a day.

109.    Upon information and belief, the staffing levels reported by RANCHO MANOR skilled nursing & therapy for the period Resident was at RANCHO MANOR were below the CMS expected levels derived from the MDS RUG rates which reflect actual acuity and not simply a resident census.

110.    Upon information and belief, the staffing levels reported by RANCHO MANOR skilled nursing & therapy for the period Resident was at RANCHO MANOR were below the CMS expected levels derived from the MDS RUG rates which reflect actual acuity and not simply a resident census.



**Undercapitalization/Underfunding at RANCHO MANOR**

111.    SW, MILSTEIN, WOLFE, and RANCHO MANOR had a duty to provide financial resources and support to RANCHO MANOR in a manner that would ensure that each of their residents received the necessary care and services and attain or maintain the highest practicable physical, mental, and psychosocial well-being, consistent with their residents' comprehensive assessments and plans of care.

112.    SW, MILSTEIN, WOLFE, and RANCHO MANOR had a duty to provide sufficient financial resources to ensure there was enough properly trained and supervised staff to meet the needs of their residents.

113.    Upon information and belief, RANCHO MANOR had no autonomy to decide their own financial course, including no authority to determine how much staff they could provide or what resources were available to the staff.

114.    Upon information and belief, no individuals at RANCHO MANOR are involved in decision making about the financial operations or what its resources were and where they would be spent.

115.    Transactions directed by WOLFE, MILSTEIN, and SW left RANCHO MANOR with insufficient cash to provide sufficient qualified staff to meet the individual needs of the residents in their RANCHO MANOR during Resident's time there.



*Filing of*
*Steele Chaffee*

## LEGAL BASIS FOR WOLFE, MILSTEIN, AND SW'S LIABILITY

### Joint Venture/Enterprise

116.    WOLFE, MILSTEIN, and SW are collectively referred to herein as the "Corporate Defendants."

117.    The Corporate Defendants directed, operated and managed the day-to-day functions of their nursing facilities – including RANCHO MANOR – by developing and implementing policies, practices and procedures affecting all facets of RANCHO MANOR, including resident care.

118.    These policies manipulate and control the physical and financial resources, and prohibit decision making at RANCHO MANOR level.

119.    This directly affects resident care by determining things such as what type and quality of nourishment is available for residents; what safety measures may and may not be used depending upon cost; the integrity of the building itself; and most importantly, how much staff is available to provide resident care and how well trained and supervised are the staff to meet the needs of the residents.

120.    These policies and practices were developed and implemented without regard to the needs of the residents and, in fact, mandated the reckless disregard for the health and safety of RANCHO MANOR's residents.

121.    The Corporate Defendants affirmatively chose and decided to establish such operations and demand they be implemented.

122.    Upon information and belief, such operations included, *inter alia*, the following dangerous policies and practices: (a) the aggressive recruitment and admission of high acuity patients to increase the patient census when Defendants had already chosen to understaff RANCHO MANOR and continually maintain a staff that were not qualified nor competent to provide the care required by state law, regulations and minimum standards of the medical community; and (b) the decision to retain residents whose needs exceeded the qualification and care capability of RANCHO MANOR's staff.

123.    The Corporate Defendants consciously chose not to implement safety policies, procedures and systems which would ensure that: (a) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (b) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

124.    The Corporate Defendants, conduct themselves in a manner which indicates a joint venture/enterprise amongst them, to wit:

    a.  The shared interest in the operation and management of nursing facilities;

    b.  The express and implied agreements amongst them to share in the profits and losses of such venture/enterprise; and

    c.  The obvious actions taken showing the cooperation in furthering the venture/enterprise operating and managing nursing facilities.


*Filing of*
*Steele Chaffee*

125.     Missouri law recognizes a joint venture/enterprise where the parties alleged to be partners in such venture/enterprise share a common interest in the property or activity or the joint venture; maintain agreements, either express or implied, to share in profits or losses of the venture/enterprise; and express actions or conduct showing cooperation in the project of the venture/enterprise.

126.     The Corporate Defendants share a common interest in the operation and management of nursing facilities, including RANCHO MANOR; maintain agreements to share in the profits or losses of the operation of nursing facilities described herein; and operate daily evincing conduct which indicates their cooperation in the venture of operating and managing nursing facilities for profit.

127.     The Corporate Defendants and RANCHO MANOR took direct, overt and specific actions to further the interest of the joint enterprise.

128.     These actions were taken through a joint venture/enterprise or through the Corporate Defendants and RANCHO MANOR's officers, directors, managers and or employees.

129.     The Corporate Defendants had an equal right to share in the profits and to bear liability for, the joint venture/enterprise.

130.     Further, because the Corporate Defendants and RANCHO MANOR were dominated by each other, these entities had an equal right to direct or control their venture, as well as to direct or control the operation and management of RANCHO MANOR.



*Filing of*
*Steele Chaffee*

Direct Participation/Individual Actions

131.     The Corporate Defendants were always material to this lawsuit in the business of managing, owning and operating a network of nursing homes throughout the State of Missouri. One such nursing home was RANCHO MANOR where Resident was admitted for care and treatment.

132.     At all times material to this lawsuit, the Corporate Defendants were fully aware that the delivery of essential care services in each of their nursing homes – including RANCHO MANOR – hinged upon three fundamental fiscal and operational policies which were dictated by their choices on establishing and implementing such policies: (1) the determination of the numbers and expenditures on staffing levels; (2) the determination of the census levels within the nursing home; and, (3) payor mix.

133.     At all times material, the Corporate Defendants made critical operational decisions and choices which manipulated and directly impacted RANCHO MANOR's revenues and expenditures.  More particularly, the Corporate Defendants determined:

    a.   The number of staff allowed to work in their chains of nursing homes including RANCHO MANOR;

    b.   The expenditures for staffing at the nursing homes including RANCHO MANOR;

    c.   The revenue targets for each nursing home including RANCHO MANOR;

    d.   The payor mix, and, census targets for each nursing home including RANCHO MANOR;

    e.   Patient recruitment programs and discharge practices at each nursing home including RANCHO MANOR.



134.    All cash management functions, revenues and expenditure decisions at the nursing home level – including RANCHO MANOR – were tightly managed, directed, and supervised by the Corporate Defendants.

135.    It was the choices made by the Corporate Defendants which directly fixed the circumstances in the facilities and the level of care that could, and was, provided at the homes, including RANCHO MANOR.

136.    The Corporate Defendants formulated, established and mandated the application and implementation of the policies regarding the staffing levels and expenditures, the census levels, and payor mix.

137.    The census edicts, marketing and admission practices, and resident discharge policies designed and mandated by the Corporate Defendants were implemented and such application was carefully supervised and enforced.

138.    Following the mandates, RANCHO MANOR functioned in accordance within them, filling empty beds, recruiting high acuity patients, and maintaining a census level and staffing level established and enforced as the Corporate Defendants deemed appropriate.

139.    Accordingly, such manipulation by the Corporate Defendants as to staffing and census were motivated by the financial needs of the Corporate Defendants and RANCHO MANOR as opposed to the acuity levels and needs of the residents as dictated by state and federal laws and regulations.



140.     Instead of abiding by their duty to care for the residents, the Corporate Defendants chose to be guided by financial motivation which was simply to increase revenues while restricting and/or reducing expenses.

141.     The Corporate Defendants, therefore, directly participated in a continuing course of negligent conduct, requiring RANCHO MANOR to recruit and retain heavier care, higher pay residents to RANCHO MANOR even though the needs of the patient population far exceeded the capacity of staff.

142.     At the same time, the Corporate Defendants chose to design, create, implement and enforce operational budgets at RANCHO MANOR which dictated the level of care that could be provided and therefore deprived residents care, creating widespread neglect.

143.     In so doing, the Corporate Defendants disregarded, superseded, and violated the duties and responsibilities imposed on a licensed nursing home, in this case RANCHO MANOR, by the State of Missouri, and the federal government.

### Corporate Malfeasance

144.     The Corporate Defendants consciously chose not to implement safety policies, procedures and systems which would ensure that: (1) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (2) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

145.     Accordingly, the Corporate Defendants, by their operational choices and decision making, and to satisfy their desire to grow profits, created a dangerous condition that caused harm to residents.



*Filing of*
*Steele Chaffee*

33

146.     These choices to establish and implement such policies and the conscious decision not to implement corrective actions or procedures disregarded the duties which the State of Missouri and federal government imposed upon the Corporate Defendants and RANCHO MANOR.

147.     Because the staffs were below necessary levels, and because the staffs that were present were not properly qualified or trained, the residents at RANCHO MANOR including Resident, failed to receive even the most basic care required to prevent catastrophic injury and death.  This negligence and resulting injuries ultimately led to and caused Resident's injuries and death as described above.

148.     During Resident's residency at RANCHO MANOR, Resident sustained physical injuries and died, as described in more detail above, because of the acts, omissions, decisions and choices made by the Corporate Defendants in operating RANCHO MANOR.

149.     During Resident's residency at RANCHO MANOR, the Corporate Defendants negligently failed to provide and/or hire, supervise and/or retain staff capable of providing Resident with a clean, safe and protective environment, and that, as a result of this failure, Resident suffered neglect, abuse, severe personal injuries, conscious pain and suffering, and deterioration of Resident's physical condition as further described above.  Ultimately, Resident died because of this failure.



150.     The Corporate Defendants manage, operate and direct the day-to-day operations of RANCHO MANOR and these Corporate Defendants are liable for this direct involvement in the operations of such RANCHO MANOR. These Corporate Defendants are therefore liable to the Plaintiff for the neglect of and injuries to Resident.

151.     RANCHO MANOR and these Corporate Defendants have been named as Defendants in this lawsuit for their individual and direct participation in the torts and causes of action made the basis of this lawsuit, having:

  a.   Chosen to disregard the duties and responsibilities which RANCHO MANOR, as a licensed nursing home, owed to the State of Missouri and its residents;

  b.   Created the dangerous conditions described by interfering with and causing RANCHO MANOR to violate Missouri statutes, laws and minimum regulations governing the operation of said nursing home;

  c.   Superseding the statutory rights and duties owed to nursing home residents by designing and mandating dangerous directives, policies, management and day to day operation of RANCHO MANOR;

  d.   Caused the harm complained of herein; and

  e.   Choosing to disregard the contractual obligations owed to the State of Missouri and the Federal Government to properly care for the residents in exchange for payment of funds for such care.

### COUNT I - (Wrongful Death v. All Defendants)

152.     Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

153.     This Count accrued after the August 28, 2015, effective date of the amendments to RSMo. § 538.210.1. *See Coover v. Moore*, 31 Mo. 574, 576 (Mo. 1862); *Cummins v. Kansas City Pub. Serv. Co.*, 66 S.W.2d 920, 929 (Mo. banc 1933); *Nelms v. Bright*, 299 S.W.2d 483, 487 (Mo. banc 1957); *Boland v. St. Luke's Health System, Inc.*, 471 SW 3d 703 (Mo. 2015) (banc).

154.     At all times material hereto Resident was in a defenseless and dependent condition.

155.     As a result of Resident's defenseless and dependent condition, Resident relied upon Defendants to provide for their safety, protection, care and treatment.

156.     At the time of the negligent acts and occurrences complained of herein and at all other times relevant hereto, Defendants, and their agents and employees, owed a legal duty to Resident to exercise that degree of skill and learning ordinarily exercised by members of their respective professions under the same or similar circumstances.

157.     At all relevant times, Defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing facility.

158.     These duties required Defendants to implement and enforce policies and procedures to ensure the proper care for, and treatment of all residents including Resident.

159.     These duties required Defendants to have sufficient and qualified staff at RANCHO MANOR nursing home to ensure the proper care for, and treatment of all residents including Resident.

160.     These duties required Defendants to ensure that RANCHO MANOR's nurses and other staff were properly educated and trained regarding the care for, and treatment of all residents including Resident.

161.     These duties required Defendants to ensure that RANCHO MANOR was properly capitalized to ensure the proper care for, and treatment of all residents including Resident.

 *Filing of Steele Chaffee*

162.    Specifically, during their care and treatment of Resident, Defendants and their agents, servants, and/or employees breached their duties and were guilty of the following acts of negligence and carelessly by failing to measure up to the requisite standard of care, skill, and practice ordinarily exercised by members of their profession under the same or similar circumstances, including by:

    a.  Failing to adequately assess, monitor, document, treat, and respond to Resident's physical condition as well as Resident's skin condition;

    b.  Failing to adequately assess Resident's risk of developing skin breakdown and pressure ulcers and urinary tract infection;

    c.  Failing to have enough staff at the Facility to ensure Resident's needs were being met regarding skin care and pressure ulcer prevention;

    d.  Failing to provide adequate assistive devices and interventions to prevent Resident's skin breakdown and pressure ulcers and urinary tract infection;

    e.  Failing to enact and carry out an adequate Care Plan regarding Resident's increased risk for skin breakdown and pressure ulcers and urinary tract infection;

    f.  Failing to provide adequate preventative skin care to Resident;

    g.  Failing to provide adequate assistance and assistive devices to prevent Resident's skin breakdown and pressure ulcers and urinary tract infection;

    h.  Failing to appropriately assess and maintain clean and dry skin where Resident developed a pressure ulcer;

    i.  Failing to turn and reposition Resident every two (2) hours;

    j.  Failing to utilize proper procedures for scheduling of turning and repositioning;

    k.  Failing to adequately assess, monitor, ensure, and document the administration of adequate nutrition and hydration to Resident;

    l.  Failing to adequately and concisely document the measurement of Resident's wounds for proper and efficient wound treatment, management, and progression;

    m.  Failing to prevent the development and worsening of Resident's pressure ulcers and urinary tract infection;



n.   Failing to adequately, timely and consistently prevent, assess, and treat Resident's pressure ulcer;

o.   Failing to have and/or implement appropriate policies and procedures regarding the prevention, assessment, and treatment of pressures ulcers in residents like Resident;

p.   Failing to carry out and follow standing orders, instructions and protocol regarding the prevention of Resident's skin breakdown and pressure ulcers and urinary tract infection;

q.   Failing to ensure the nursing home was properly capitalized.

r.   Failing to perform and measure up to the requisite standards of care required and observed by health care providers and further particulars presently unknown to Plaintiff, but which is verily believed and alleged will be disclosed upon proper discovery procedures during this litigation.

163.   Defendants, as the owners, operators, and/or managers of skilled care nursing facilities licensed by the State of Missouri and accepting Medicare and Medicaid funds, were subject to regulations promulgated by the Missouri Division of Social Services and under the Social Security Act.

164.   While providing care and treatment to Resident, Defendants and their agents, servants and/or employees breached their duty to Resident and were guilty of acts of negligence and negligence, *per se*, in violating regulations governing residential care facilities including but not limited to the following:

a.   19 C.S.R. 30-85.042(3). The operator shall be responsible to assure compliance with all applicable laws and rules.  The administrator shall be fully authorized and empowered to make decisions regarding the operation of the Facility and shall be held responsible for the actions of all employees. The administrator's responsibilities shall include the oversight of residents to assure that they receive appropriate nursing and medical care;

b.   19 C.S.R. 30-85.042(6).  the Facility shall not knowingly admit or continue to care for residents whose needs cannot be met by the Facility directly or in cooperation with outside resources. Facilities which retain residents needing skilled nursing care shall provide licensed nurses for these procedures;



c.  19 C.S.R. 30-85.042(13).  the Facility shall develop policies and procedures applicable to its operation to insure the residents' health and safety and to meet the residents' needs.  At a minimum there shall be policies covering personnel practices, admission, discharge, payment, medical emergency treatment procedures, nursing practices, pharmaceutical services, social services, activities, dietary, housekeeping, infection control, disaster and accident prevention, residents' rights and handling residents' property;

d.  19 C.S.R. 30-85.042(15).  All personnel shall be fully informed of the policies of the Facility and of their duties;

e.  19 C.S.R. 30-85-14.042(16). All persons who have any contact with the residents in the Facility shall not knowingly act or omit any duty in a manner which would materially and adversely affect the health, safety, welfare or property of a resident;

f.  19 C.S.R. 30-85.042(22).  the Facility must ensure there is a system of in-service training for nursing personnel which identifies training needs related to problems, needs, care of residents dehydration, total kidney failure, and infection control and is sufficient to ensure staff's continuing competency;

g.  19 C.S.R. 30-85.042(37).  All facilities shall employ nursing personnel in sufficient numbers and with sufficient qualifications to provide nursing and related services which enable each resident to attain or maintain the highest practicable level of physical, mental and psychosocial well-being.  Each facility shall have a licensed nurse in charge who is responsible for evaluating the needs of the residents on a daily and continuous basis to ensure there are sufficient trained staff present to meet those needs;

h.  19 C.S.R. 30-85.14.042(66). Each resident shall receive twenty four (24)-hour protective oversight and supervision;

i.  19 C.S.R. 15-14.042(67).  Each resident shall receive personal attention and nursing care in accordance with his/her condition and consistent with current acceptable nursing practice;

j.  19 C.S.R. 15-14.042 (70) Residents who are physically or mentally incapable, or both, of changing their own positions shall have their positions changed at least every two (2) hours and shall be provided supportive devices to maintain good body alignment.

k.  19 C.S.R. 30-85.042(79). In the event of accident, injury or significant change in the resident's condition, facility staff shall notify the resident's physician in accordance with the Facility's emergency treatment policies which have been approved by the supervising physician;



l.   19 C.S.R. 30-85.042(80). In the event of accident, injury or significant change in the resident's conditions, facility staff shall immediately notify the person designated in the resident's record as the designee or responsible party; and

m.   19 C.S.R. 30-85.042(81). Staff shall inform the administrator of accidents, injuries or unusual occurrences which adversely affect, or could adversely affect the resident. the Facility shall develop and implement responsive plans of action.

165.   Resident was a member of the class of persons intended to be protected by the enactment of the regulations.

166.   The physical injuries Resident incurred were the type of injuries that the regulations were enacted to prevent.

167.   As a direct and proximate result of the individual and collective acts of negligence of Defendants as described above, Resident was harmed and suffered non-economic damages limited to death, pain, suffering, and mental anguish.

168.   As a direct and proximate result of the individual and collective acts of negligence of all Defendants as described above, Plaintiff, suffered non-economic damages limited to loss of companionship, loss of comfort, loss of guidance, loss of counsel and loss of instruction, pain, suffering, and mental anguish.

169.   The actions of defendants were malicious, wanton, grossly negligent and reckless, and performed in reckless disregard of the welfare and safety of Resident and others, such that, in addition to damages for pain and suffering, defendants are liable for aggravating circumstances damages for their grossly negligent care of Resident.



170.    At the time defendants caused and allowed Resident to suffer an avoidable urinary tract infection and develop an avoidable pressure injury and permit the injury to become infected, they knew that their conscious disregard to provide adequate staff and properly capitalize RANCHO MANOR created a high degree of probability of injury to residents, and consciously disregarded the safety of all residents including Resident.

171.    Accordingly, defendants showed a complete indifference to, or conscious disregard, for the safety of others, including Resident and warrants aggravating circumstances damages be assessed against defendants in an amount that is fair and reasonable and will punish defendants and deter them and others from similar conduct.

172.    As a direct and proximate result of defendant's acts resulting in an understaffed and undercapitalized nursing home, and complete indifference to, or conscious disregard, for the safety of others, including Resident, Resident was harmed and suffered damages, including but not limited to pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life; death; and other damages.

WHEREFORE, Plaintiff(s), prays for judgment against Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances, limited to the noneconomic damages described above.


Filing of
Steele Chaffee

## COUNT II - (Alter Ego v. Defendants WOLFE, MILSTEIN and SW)

173.     Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

174.     For the purposes of this Count Defendants WOLFE, MILSTEIN, and SW are hereinafter referred to as the "Alter Ego Defendants".

175.     RANCHO MANOR ("Subsidiaries") are so dominated by the Alter Ego Defendants that the Subsidiaries are a mere instrument of the Alter Ego Defendants and are indistinct from the Alter Ego Defendants.

176.     In fact, the Subsidiary is controlled and influenced by the Alter Ego Defendants in that the Alter Ego Defendants exercised complete control and domination over the Subsidiaries finances and business practices.

177.     Specifically, the Alter Ego Defendants' complete control and domination over the Subsidiaries caused RANCHO MANOR's undercapitalization and understaffing while Resident was at RANCHO MANOR.

178.     Upon information and belief, the Alter Ego Defendants' complete control and domination over the Subsidiaries caused the Subsidiaries to operate at a loss during the years of 2020 and 2021.

179.     Upon information and belief, the Alter Ego Defendants' complete control and domination over the Subsidiaries caused the Subsidiary's liabilities to exceed its assets by during the years 2020 and 2021.  Specifically:

   a.   The Alter Ego Defendants own all or most of the capital stock of the Subsidiaries;


*Filing of*
*Steele Chaffee*

42

b.   The Alter Ego Defendants and the Subsidiaries have common directors or officers;

c.   The Alter Ego Defendants finance the Subsidiaries;

d.   The Alter Ego Defendants subscribe to all the capital stock of the Subsidiaries;

e.   The Alter Ego Defendants caused the incorporation of the Subsidiaries;

f.   RANCHO MANOR has grossly inadequate capital;

g.   The Alter Ego Defendants pay the salaries and other expenses or losses of the Subsidiaries;

h.   The Alter Ego Defendants use the property of the Subsidiaries as its own; and

i.   The directors or executives of the Subsidiaries do not act independently in the interest of the Subsidiaries but take their orders from the Alter Ego Defendants in the latter's interest.

180.   Thus, the Alter Ego Defendants used the corporate cloak of the Subsidiaries as a subterfuge to defeat public convenience, to justify a wrong, and/or to perpetrate a fraud in that the Alter Ego Defendants' complete control and domination of the Subsidiaries depleted all the Subsidiary's assets, thereby making it unable to pay a judgment resulting from its care of residents including Resident.

181.   This undercapitalization and understaffing violated RANCHO MANOR's duties under 19 C.S.R. § 30-85.042 and the applicable standard of care owed by a nursing home operator or manager to RANCHO MANOR's residents.

182.   As a direct and proximate result of the individual and collective acts of negligence of the Subsidiaries – and the Alter Ego Defendants – Resident was harmed and suffered non-economic damages limited to death, pain, suffering, and mental anguish.



183.     As a direct and proximate result of the individual and collective acts of negligence of the Subsidiaries, – and the Alter Ego Defendants – Plaintiff, suffered non-economic damages limited to loss of companionship, loss of comfort, loss of guidance, loss of counsel and loss of instruction, pain, suffering, and mental anguish.

184.     The actions of the Alter Ego Defendants were malicious, wanton, grossly negligent and reckless, and performed in reckless disregard of the welfare and safety of Resident and others, such that, in addition to damages for pain and suffering, defendants are liable for aggravating circumstances damages for their grossly negligent care of Resident.

185.     At the time Alter Ego Defendants caused and allowed Resident to suffer an avoidable urinary tract infection and develop an avoidable pressure injury and permit the injury to become infected, they knew that their conscious disregard to provide adequate staff and properly capitalize RANCHO MANOR created a high degree of probability of injury to residents, and consciously disregarded the safety of all residents including Resident.

186.     Accordingly, Alter Ego Defendants showed a complete indifference to, or conscious disregard, for the safety of others, including Resident and warrants aggravating circumstances damages be assessed against defendants in an amount that is fair and reasonable and will punish defendants and deter them and others from similar conduct.

187.     As a direct and proximate result of Alter Ego Defendants acts resulting in an understaffed and undercapitalized nursing home, and complete indifference to, or conscious disregard, for the safety of others, including Resident, Resident was harmed and suffered non-economic damages limited to death, pain, suffering, and mental anguish.



WHEREFORE, Plaintiff(s), prays for judgment against Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances, limited to the noneconomic damages described above.

### COUNT III - (Corporate Negligence v. RANCHO MANOR, WOLFE, MILSTEIN, AND SW)

188.    Plaintiff incorporates by reference all the foregoing allegations in this Complaint as though fully set forth herein.

189.    For the purposes of this Count, Defendants RANCHO MANOR, WOLFE, and SW are hereinafter referred to as the "Corporate Defendants."

190.    Plaintiff pursues this claim for Corporate Negligence pursuant to *LeBlanc v. Research Belton Hosp.*, 278 S.W. 3d 201 (Mo. App. W.D 2008).

191.    At all relevant times, the Corporate Defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing facility.

192.    These duties required the Corporate Defendants to ensure that RANCHO MANOR had sufficient and qualified staff at RANCHO MANOR to ensure the proper care for, and treatment of all residents including Resident.

193.    These duties also required the Corporate Defendants to ensure that RANCHO MANOR was properly capitalized to ensure the proper care for, and treatment of all residents including Resident.

194.    As described above, the Corporate Defendants, failed to ensure RANCHO MANOR had enough staff and capital during the year of this incident as described above and the two years before the incident described above.

195.    As a direct and proximate result of the Corporate Defendants' acts resulting in an understaffed and undercapitalized nursing home while Resident was at RANCHO MANOR, Resident was harmed and suffered non-economic damages limited to death, pain, suffering, and mental anguish.

196.    As a direct and proximate result of the Corporate Defendants' acts resulting in an understaffed and undercapitalized nursing home while Resident was at RANCHO MANOR, Plaintiff, suffered non-economic damages limited to loss of companionship, loss of comfort, loss of guidance, loss of counsel and loss of instruction, pain, suffering, and mental anguish.

197.    The actions of defendants were malicious, wanton, grossly negligent and reckless, and performed in reckless disregard of the welfare and safety of Resident and others, such that, in addition to damages for pain and suffering, defendants are liable for aggravating circumstances damages for their grossly negligent care of  Resident.

198.    At the time defendants caused and allowed Resident to suffer an avoidable urinary tract infection and develop an avoidable pressure injury and permit the injury to become infected, they knew that their conscious disregard to provide adequate staff and properly capitalize RANCHO MANOR created a high degree of probability of injury to residents, and consciously disregarded the safety of all residents including Resident.



199.    Accordingly, Corporate Defendants showed a complete indifference to, or conscious disregard, for the safety of others, including Resident and warrants aggravating circumstances damages be assessed against Corporate Defendants in an amount that is fair and reasonable and will punish Corporate Defendants and deter them and others from similar conduct.

200.    As a direct and proximate result of Corporate Defendants' acts resulting in an understaffed and undercapitalized nursing home, and complete indifference to, or conscious disregard, for the safety of others, including Resident, Resident was harmed and suffered non-economic damages limited to death, pain, suffering, and mental anguish.

WHEREFORE, Plaintiff(s), prays for judgment against Defendants in an amount more than $25,000.00 and in an amount a jury deems fair and reasonable under the circumstances, limited to the noneconomic damages described above.

### PLAINTIFF'S DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE

Respectfully Submitted,

STEELE CHAFFEE, LLC

By:   */s/ Jonathan Steele*

Jonathan Steele  MO #63266
2345 Grand Boulevard, Suite 750
Kansas City, MO 64108
Ph: (816) 466-5947
Fax: (913) 416-9425
jonathan@nursinghomeabuselaw.com

ATTORNEYS FOR PLAINTIFF